**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **FEDERAL DEPOSIT INSURANCE** | ) | |
| **CORPORATION AS RECEIVER FOR** | ) | |
| **VALLEY BANK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. _____** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CROWE HORWATH LLP,** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **Defendant.** | ) | |

**COMPLAINT**

Plaintiff, the Federal Deposit Insurance Corporation ("FDIC") as Receiver for Valley Bank, Moline, Illinois ("FDIC-R"), for its Complaint against Crowe Horwath LLP ("Crowe"), states as follows:

## I.    INTRODUCTION

1.    The FDIC-R brings this lawsuit as Receiver for Valley Bank, Moline, Illinois ("Valley" or "Bank") to recover damages of at least $21 million caused by Crowe's malpractice in auditing the consolidated financial statements of Valley's holding company, River Valley Bancorp, Inc. ("RVBI") in 2010 and 2011 ("2010 Audit" and "2011 Audit," respectively).

2.    In performing the 2010 Audit and the 2011 Audit, Crowe failed to follow required professional standards and, in violation of the duties owed to Valley, issued unqualified audit opinions on Valley's financial statements.  As a result of Crowe's malpractice, Crowe failed to discover, and later, after having discovered evidence that would have put a reasonable auditor on notice, failed to disclose, a scheme perpetrated by Valley's Chief Executive Officer ("CEO") Larry C. Henson ("Henson") to mask the Bank's deteriorating financial condition.

3.     Crowe's malpractice allowed Henson to continue to originate and fund millions of dollars of loans in 2011, 2012, and 2013.  These loans – that violated a 2009 Cease and Desist Order – were part of Henson's scheme to conceal the deteriorating financial condition of Valley. The scheme continued until June 2013, when Henson's malfeasance was discovered by regulators, and Henson was forced to resign.  The FDIC-R seeks punitive damages due to Crowe's willful and wanton deviation from basic auditing standards, such as due care, professional skepticism, sampling, and contact with the predecessor auditors.  In addition, the FDIC-R seeks punitive damages given that Crowe knew that Valley had inadequate internal controls, ignored known fraud risks in the performance of the 2010 Audit and the 2011 Audit (even when those risks were realized and identified by the audit engagement team), and issued unqualified opinions despite knowing of Valley's manipulation of its financial statements. Crowe's willful and wanton failure to address or disclose management's manipulation of its financial statement establishes its deliberate indifference to professional standards, including integrity and independence standards.  Rather than conducting the audits in compliance with professional standards, Crowe violated its fundamental audit function to act with independence and improperly concluded that RVBI's financial statements for 2010 and 2011 "present fairly, in all material respects, the financial position of the Company . . . in conformity with" generally accepted accounting principles ("GAAP").

4.     Prior to being engaged for the 2010 Audit, professional standards required Crowe to communicate with McGladrey & Pullen, LLP ("McGladrey"), Valley's prior independent external auditor.  Crowe failed to do so.  Crowe's failure to communicate with McGladrey and failure to review McGladrey's 2009 workpapers in planning the 2010 Audit meant that it lacked

critical knowledge obtained by its predecessor, which led Crowe to employ deficient audit procedures for the 2010 Audit.

5.      For the 2010 Audit, Crowe issued its unqualified opinion on the 2010 financial statements despite knowing that Valley had significant deficiencies in its internal controls (including a lack of control over Valley's internal loan reporting systems) and that Valley had no formal process for identifying loans that should be classified as troubled debt restructurings ("TDRs"). Crowe issued its unqualified opinion despite knowing that Valley engaged in Bank-financed sales of its troubled private label-mortgage backed securities ("PLMBS") to related parties, in an effort to mask problems in its balance sheet by purging nonperforming PLMBS from Valley's portfolio.  Crowe improperly approved these "sales" as complying with GAAP and issued an unqualified opinion.  Soon after the issuance of Crowe's unqualified audit report, Valley was required to restate its 2010 financial statements and unwind the PLMBS transactions because they lacked economic substance and violated GAAP.  Had Crowe performed an audit in accordance with professional standards it would not have issued an unqualified opinion, Henson's scheme to mask Valley's deteriorating financial condition would have been discovered as much as two years earlier, and Henson would have been forced to resign—preventing further harm to the Bank.

6.      During the 2011 Audit, Crowe knew, but failed to disclose, that Henson was misstating Valley's financial statements by failing to record loan losses and manipulating the Bank's Allowance for Loan and Lease Losses ("ALLL").  In a February 29, 2012, e-mail exchange, the Crowe in-charge auditor told the audit engagement partner and the audit manager that he suspected that "the bank is managing [its] earnings through the ALLL calculation" by adjusting its ALLL methodology to reach a pre-determined result.  In an email response, the

Crowe audit manager confirmed that Valley had been trying to "skirt the system" and that it should be required to provide "air tight support" for its assumptions, which the manager acknowledged would have to be "audited in detail" and which he expected "they will not provide." The audit manager recognized that Valley is "looking at the ending [number] and amending the methodology to match that [number], and that is not acceptable." Despite identifying a key aspect of Henson's scheme to manipulate Valley's financial statements, Crowe did not receive air tight support, did not audit in detail, and did not test the ALLL assumptions. Rather, Crowe blindly accepted the Bank's contrived numbers and improperly issued an unqualified audit opinion without sufficient appropriate audit evidence to support that opinion.

7.      Despite numerous audit failures and breaches of professional duties, Crowe improperly issued unqualified audit opinions for 2010 and 2011. Had Crowe done anything other than issue an unqualified opinion, Henson's manipulation of Valley's financial statements would have been discovered and the Bank would not have sustained the substantial losses on loans Henson originated between 2011 and his forced resignation in 2013. Crowe's malpractice allowed Henson to continue to make loans that violated the 2009 Cease and Desist Order for an additional two years, resulting in more than $21 million in further losses.

## II.      THE PARTIES

### A.      Plaintiff

8.      The FDIC is a corporation and an instrumentality of the United States of America established under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-1835a. On June 20, 2014, the Illinois Department of Financial and Professional Regulation ("IDFPR") appointed the FDIC as Receiver for Valley Bank. 12 U.S.C. § 1821(c). The FDIC-R is acting in its capacity as Receiver and is empowered to sue and complain in any court of law pursuant to 12 U.S.C.

§ 1819.  Pursuant to 12 U.S.C. § 1821(d)(2)(A)(i), the FDIC-R, by operation of law, succeeded to all rights, titles, and privileges of Valley and, among others, the depositors, accountholders, and stockholders of Valley.  In this action, the FDIC-R seeks to recover damages resulting from the tortious conduct of Crowe.

**B.**    **Defendant**

9.    Defendant Crowe Horwath LLP is a certified public accounting firm that maintains its headquarters in Oak Brook, Illinois.  It is a North American member of Horwath International Association, of which each member firm is a separate and independent legal entity. Crowe Horwath LLP has partners residing in a number of states, including Illinois.

### III.    JURISDICTION AND VENUE

10.    The Court has subject matter jurisdiction over this case pursuant to 12 U.S.C. §§ 1819(b)(1) and (2) and 28 U.S.C. §§ 1331 and 1345.

11.    This Court has personal jurisdiction over Defendant who, at all relevant times, regularly conducted business in, and had substantial contacts with, the State of Illinois.

12.    This Court also has personal jurisdiction over Defendant pursuant to 735 ILCS §§ 5/2-209(a)(1) and (2).

13.    Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because it is the judicial district in which the Defendant resides.

### IV.    FACTUAL ALLEGATIONS

**A.**    **Background**

14.    Valley was established on January 31, 2002, as a result of a merger between the State Bank of Latham and Valley State Bank.  Valley's headquarters were located in Moline,

Illinois. Valley was a full-service bank that engaged in commercial and consumer lending. Valley was closed by the IDFPR on June 20, 2014.

15. RVBI was Valley's holding company. In addition to Valley, RVBI held Valley Bank (Fort Lauderdale, Florida), which was closed by the Florida Office of Financial Regulation on June 20, 2014, and Freedom Bank (Sterling, Illinois), which was divested in a private transaction prior to Valley's failure. As part of its audit of RVBI's consolidated financial statements, Crowe audited each of the banks. The Complaint and the damages sought here relate only to Crowe's malpractice with respect to Valley.

16. As Board Chairman and CEO of Valley, Henson pursued an aggressive growth strategy by sanctioning a high-risk credit culture and creating risky concentrations in commercial real estate loans and in media-related loans, an area outside of Valley's lending expertise.

17. In April and May 2009, Valley's regulators warned the Board that Valley's overly aggressive growth had led to a sharp deterioration in Valley's financial condition. The regulators found Valley was in a troubled condition, and identified specific borrower relationships, including media-related borrowers, that significantly contributed to Valley's deteriorated state.

18. On September 18, 2009, Valley entered into a Cease and Desist Order ("Consent Order") with the FDIC. The Consent Order required Valley to, among other things, maintain specific capital ratios, which were significantly impacted by Valley's level of adversely classified loans and other assets. The Consent Order remained in effect throughout Crowe's audits. Henson repeatedly made loans that violated the terms of the Consent Order.

19. Rather than comply with the Consent Order, Henson embarked on a scheme to mask the true financial condition of the Bank that included managing the Bank's earnings through the ALLL and hiding non-performing loans that would otherwise require charge-offs.

6

Henson hid non-performing loans by recycling them through larger loans that "paid off" the non-performing loans.

20.     McGladrey was Valley's independent auditor until Valley ended the relationship in or about August 2010.

21.     In October 2010, Crowe entered into an engagement letter under which Crowe was to conduct the audit of RVBI and its subsidiaries, including Valley, for the year-ended December 31, 2010.  Beginning in November of 2010, Crowe planned and executed the 2010 Audit, culminating with a March 31, 2011, Report of Independent Auditors, which concluded that the "financial statements …present fairly, in all material respects, the financial position of the Company as of December 31, 2010, ... in conformity with [GAAP]."

22.     In June 2011, Crowe entered into an engagement letter under which Crowe was to conduct audits of RVBI and its subsidiaries, including Valley, for a two-year period.  Beginning in September 2011, Crowe planned and executed the 2011 Audit, which included a restatement of Valley's 2010 financial statements, culminating with a May 21, 2012, Report of Independent Auditors, which concluded that the "financial statements…present fairly, in all material respects, the financial position of River Valley Bancorp, Inc. and Subsidiaries as of December 31, 2011 and 2010, … in conformity with [GAAP]."

23.     Crowe began, but did not complete, its audit of Valley's financial statements as of December 31, 2012 ("2012 Audit").  In December 2012, Crowe was terminated because of a dispute with Valley over the Bank's ALLL methodology, a dispute that Crowe should have had with Valley management during its earlier audits had Crowe complied with its duties.

24.    In May 2013, in the course of a routine examination of Valley, FDIC examiners discovered Henson's scheme to conceal Valley's true financial condition, and Henson was forced to resign on June 4, 2013.

**B.    Crowe Owed a Duty to Comply with Professional Standards**

25.    As Valley Bank's external auditor, Crowe had a duty to determine whether Valley's financial statements presented fairly, in all material respects, Valley's financial position and to obtain reasonable assurance that the financial statements were free from material misstatement due to error or fraud.  Reasonable assurance is a high level of assurance.  Crowe owed Valley, its client, and regulators a duty to perform its audit in accordance with applicable professional standards, including GAAP, Generally Accepted Auditing Standards ("GAAS"), independence standards promulgated by the American Institute of Certified Public Accountants ("AICPA"), the Securities Exchange Commission ("SEC"), the Public Company Accounting Oversight Board ("PCAOB"), and the AICPA Code of Professional Conduct.

26.    Federal regulations, including 12 C.F.R. § 363.3(a), required Valley to be audited by an independent Certified Public Accountant.

27.    Crowe knew that the audit opinions it issued on Valley's financial statements for the year-ended December 31, 2010, and the comparative financial statements for the years-ended December 31, 2010 and 2011, would be relied upon by Valley and its regulators.  Additionally, Valley and its regulators relied on Crowe to perform the audit in accordance with applicable professional standards.

28.    Crowe's misconduct, described further below, was performed with reckless indifference toward the rights of others, and accordingly, was willful and wanton.  Crowe violated numerous, basic auditing standards.  And Crowe's failure to act, in the face of repeated

and numerous red flags, including evidence that Bank management was improperly manipulating the Bank's financial statements, demonstrates that Crowe abandoned its role as an independent auditor, and that its audit team abandoned their basic obligations as certified public accountants.

**C.     Crowe Repeatedly Violated Professional Auditing Standards**

29.     In performing the 2010 Audit and the 2011 Audit, Crowe violated applicable professional standards and its own firm guidance.  For example, Crowe violated the auditing standards set forth in AU 150–*Generally Accepted Auditing Standards* in at least the following ways:

- Failing to maintain independence in mental attitude in all matters relating to the audit (second general standard);

- Failing to exercise due professional care in the performance of the audit and the preparation of the report (third general standard);

- Failing to adequately plan the work and properly supervise any assistants (first standard of fieldwork);

- Failing to obtain a sufficient understanding of internal controls to plan the audit and determine the nature, timing, and extent of tests to be performed (second standard of fieldwork); and

- Failing to obtain sufficient appropriate audit evidence by performing audit procedures to afford a reasonable basis for an opinion regarding the financial statements under audit (third standard of fieldwork).

30.     In addition, Crowe violated the auditing standards set forth in AU 580–*Reports on Audited Financial Statements* in at least the following ways:

- Incorrectly stating in its audit report that the financial statements were presented in accordance with generally accepted accounting principles (first standard of reporting); and

- Failing to state in the auditor's report that, taken as a whole, an opinion could not be expressed, and failing to state the reasons therefor in the auditor's report (fourth standard of reporting).

31.     Crowe also violated integrity standards, set forth in Ethics and Independence Rule ("ET") 102–*Integrity and Objectivity*, thereby impairing its independence in violation of AU 220–*Independence*, in at least the following ways:

- Issuing a misleading letter to satisfy Florida regulators regarding the Bank's ALLL methodology; and

- Failing to disclose its disagreement with management relating to the ALLL when Crowe was terminated in December 2012.

32.     These professional standards were incorporated into Crowe's own audit manual and in its audit programs used in performing the Valley audit work.

### 1. Crowe Identified Valley as a "High-Risk" Audit, But Failed to Employ Sufficient Audit Procedures to Address the Bank's High-Risk Audit Areas

33.     Crowe internally identified the Valley audit as "high-risk" and specifically identified the following areas as significant fraud risks: (1) the ALLL, which represented the most significant account estimate in the Valley financial statements; (2) the masking of problem loans by, among other things, extending due dates on loans and improper renewals; and (3) the portfolio of TDRs.  In addition, Crowe knew that Henson had previously been convicted of a federal offense in connection with his employment at another financial institution.

34.     During the 2010 Audit and the 2011 Audit, Crowe noted numerous deficiencies with Valley's internal controls, which should have caused Crowe to question the sufficiency and reliability of the Bank's accounting data.  For example, in performing the 2010 Audit, Crowe identified significant deficiencies in internal controls including, but not limited to, Valley's exclusion of over $16 million in impaired loans with specific reserves from Valley's non-accrual list, Valley's lack of controls over the identification and evaluation of TDRs, and Valley's use of stale appraisals and valuation information to value collateral.  Each of these significant deficiencies bore directly on Valley's ability to identify problem loans and record losses on a

timely basis. In performing the 2011 Audit, Crowe knew Valley did not correct the significant deficiencies in loan internal controls identified in the 2010 Audit.

35.     In performing the 2010 Audit and the 2011 Audit, Crowe further violated professional standards when it failed to determine whether Valley had a competent and independent Audit Committee.

36.     In both the 2010 Audit and the 2011 Audit, Crowe failed to design and execute appropriate audit procedures to address: (a) known fraud risks relating to the ALLL; (b) the masking of problem loans; or (c) the absence of a formal process for identifying TDRs at the Bank. Under GAAS, the audit procedures designed by the auditor generally depend on the risk of material misstatement. The greater the auditor's assessment of risk, the more reliable and relevant the audit evidence obtained from tests of the effectiveness of internal controls and substantive audit procedures must be. The auditor must plan and perform the audit to obtain sufficient appropriate audit evidence to afford a reasonable basis for an opinion and to reduce to a low level the risk that the auditor will fail to detect a material misstatement.

37.     Due care requires an auditor to exercise professional skepticism, "an attitude that includes a questioning mind and a critical assessment of audit evidence" based on the assumption that management is neither dishonest nor honest beyond doubt. AU 230.07-08.

38.     If the auditor is unable to obtain sufficient appropriate audit evidence, the auditor should express a qualified opinion or a disclaimer of opinion. If the auditor discovers significant risk of material misstatement due to fraud, the auditor should consider withdrawing from the engagement.

39.     In certain high-risk areas of the audit, Crowe's audit procedures were executed with such disregard that little to no objective audit evidence was obtained. Instead, Crowe

demonstrated pervasive overreliance on management representations.  As a result, Crowe failed to perform its Valley audits with due care and did not obtain sufficient appropriate audit evidence to issue unqualified opinions.

### 2.   Crowe Failed to Perform Appropriate Audit Procedures on the ALLL

40.     In performing its audits of Valley, Crowe was required by professional standards and its own audit program to obtain an understanding of Valley's internal controls relating to loans and the ALLL and to consider all internal control issues it identified in designing its audit procedures.  Crowe was responsible for auditing the ALLL, including management's methodology.

41.     Crowe failed to consider the loan internal control issues it identified, and as alleged below, performed inadequate audit procedures.  Crowe then performed these inadequate procedures in such a grossly deficient manner that Crowe failed to obtain sufficient appropriate audit evidence required by GAAS to issue unqualified opinions.

42.     The ALLL reduced the value of the "Loans" asset on Valley's balance sheet.  An increase to the ALLL had a corresponding negative impact on Valley's capital ratios.  The ALLL has two components: losses on individually evaluated loans that are impaired pursuant to Financial Accounting Standard ("FAS") 114, and estimated losses inherent in the remainder of the loan portfolio pursuant to FAS 5.  In an effort to make it appear as if the Bank was complying with the capital ratios mandated by the Consent Order, Henson sought to understate the Bank's ALLL.

43.     Under FAS 114, an individual loan is impaired when, based on current information and events, it is probable that a bank will be unable to collect all amounts due

12

according to the terms of the loan.  Pursuant to applicable standards, FAS 114 loans are to be individually evaluated for impairment.

44.    Methods to measure FAS 114 impairment include: (1) present value of expected future cash flows discounted at the loan's effective interest rate, (2) loan's observable market price, or (3) for a collateral dependent loan, the fair value of the collateral.  A loan is collateral dependent if repayment of the loan is expected to be provided by the underlying collateral.  If a FAS 114 loan is impaired, the probable loss is recorded by increasing the ALLL, and may be referred to as a "specific reserve" or "specific valuation allowance" ("SVA").  In addition, if a loan analyzed under FAS 114 is determined to not be impaired, the loan should be analyzed under FAS 5.

45.    Under FAS 5, all non-impaired loans (*i.e.* all loans that are not impaired under FAS 114) should be evaluated for impairment to estimate the probable loss inherent to a loan portfolio.  Non-impaired loans may be grouped into homogeneous loan pools with similar risk characteristics and each loan pool's historical loss ratio is calculated.  Authoritative standards identify suitable "qualitative factors" that a financial institution may use to adjust calculated historical loss ratios, such as an adjustment for economic conditions.  The loss ratio for each loan pool is then projected onto the current balance of the pool to estimate the inherent loss in the portfolio and is recorded by increasing the ALLL.  The FAS 5 component of the ALLL may be referred to as a "general reserve" or "general valuation allowance" ("GVA").

**3. Crowe Failed to Perform Required Loan Reviews, or Failed to Perform Loan Reviews Consistent with Auditing Standards, and Improperly Assessed the Bank's SVA**

46.    Crowe's own audit program required it to perform loan reviews to test whether Valley's loans were impaired.  In the 2010 Audit, Crowe breached its professional duties by

failing to conduct an adequate impaired loan analysis. Crowe's 2010 ALLL workpapers refer to its review of impaired loans in the Loans section of the audit. However, the Loan workpapers refer to its review of impaired loans in the ALLL section of the audit without any additional analysis. This circular reference in Crowe's workpapers demonstrates that Crowe failed to complete a sufficient review of Valley's impaired loans. As a result, Crowe failed to obtain sufficient audit evidence to conclude that Valley was correctly identifying impaired loans and to conclude that Valley's SVA amounts were adequate.

47. In connection with the required impaired loan analysis for the 2011 Audit, Crowe originally selected 13 loans on which to perform loan reviews to assess possible impairment. Crowe thereafter changed its audit procedures and limited its impaired loan review to just 10 loans, thereby improperly excluding from its audit procedures two of the Bank's most troubled lending relationships. Valley's regulators forced the Bank to take $4.5 million in charge-offs on one of the three loans Crowe inexplicably and improperly omitted from its loan review.

48. In addition, the loan reviews that Crowe did perform in 2011 failed to comply with auditing standards. For example, in its review of a loan to the Denver TV Group, Crowe concluded that Valley's specific reserve of $205,000 was not necessary given that the loan had a purported collateral excess of $7.8 million. To reach this conclusion, Crowe relied on a stale appraisal from August 2008. Moreover, the appraisal was in draft form, and noted that it was to be used only "for internal due diligence and analysis" by an earlier borrower of Valley. Reliance on a draft appraisal that was not prepared for Valley but for a previous borrower violated professional standards, including, but not limited to, AU 336–*Using the Work of a Specialist* and Crowe's own audit program.

**4.  Crowe Improperly Accepted Valley's Manipulation of the GVA**

49.     Crowe also failed to perform required audit procedures relating to Valley's GVA for the 2011 Audit.  Valley provided Crowe with a calculation for the "required" GVA that applied historical loss ratios to their respective loan pools, increased the GVA balance with an Economic Conditions Adjustment, and then reduced the GVA balance for a Portfolio Concentration Adjustment ("PCA").  The total required SVA and GVA reserves were then compared with the ALLL balance on Valley's balance sheet to determine whether the ALLL was underfunded and needed to increase.

50.     Crowe documented that the PCA had the effect of excluding losses Valley incurred on three loans from the GVA calculation because Valley determined those losses inaccurately projected future losses.  However, Valley provided at least three different GVA calculations to Crowe in connection with the 2011 Audit.  The first GVA calculation applied a PCA to three loan pools to reduce the required ALLL by $1,488,075.  The second GVA calculation applied a PCA to four loan pools to reduce the required ALLL by $2,139,410.  The third GVA calculation applied a PCA to eight loan pools to reduce the required ALLL by $3,432,413.  A copy of each of these GVA calculations is included in Crowe's workpapers for the 2011 Audit.

51.     Crowe was required by professional standards and its own audit program to test the factors Valley used to adjust its GVA calculation by performing audit procedures including, but not limited to, understanding management's process for developing all qualitative factors, corroborating data used by management in developing qualitative factors to an objective source, and considering whether management's assumptions are consistent with each other and supported by relevant data and trends.  However, Crowe's audit procedures failed to corroborate

the PCA to an objective source or consider whether the PCA was supported by relevant data and trends. Accordingly, Crowe did not obtain reliable evidence regarding why these three loans were so unique that each was reasonably excluded from the GVA calculation. Furthermore, when Crowe received new GVA calculations with increasing amounts of PCA, Crowe did not document an understanding of why loss histories of additional loan pools were excluded from the calculation and Crowe did not document any analysis of the increasing dollar amount that offset the "required" GVA reserve.

52. Crowe violated professional standards, including AU 230–*Due Professional Care in the Performance of Work*, when it failed to exercise the required heightened professional skepticism with respect to the ALLL. Heightened professional skepticism was required for several reasons, including Crowe's identification of the ALLL as a significant material fraud risk, Crowe's understanding that Valley had an incentive to avoid recording loan losses to reduce the ALLL, and Crowe's knowledge that Valley was manipulating the ALLL.

53. Crowe failed to exercise professional skepticism when it, among other things, ignored evidence it obtained during the 2011 Audit relating to the GVA, including that Valley was manipulating the GVA calculation to force Valley's desired result to minimize the required ALLL. For example, in a February 29, 2012, e-mail exchange, the Crowe in-charge auditor told the audit engagement partner and the audit manager that he suspected that "the bank is managing [its] earnings through the ALLL calculation" by adjusting its ALLL methodology to reach a pre-determined result. In an email response, the Crowe audit manager confirmed that Valley had been trying to "skirt the system" and that it should be required to provide "air tight support" for its assumptions, which the manager admitted would have to be "audited in detail" and which he expected "they will not provide." The audit manager recognized that Valley is "looking at the

16

ending [number] and amending the methodology to match that [number], and that is not acceptable." Crowe blindly accepted the Bank's contrived numbers, and improperly issued an unqualified audit opinion without sufficient appropriate audit evidence to support that opinion. In addition, Crowe knew that the number of loan pools upon which Valley applied the PCA grew over time, that the dollar value of GVA losses Valley avoided recording increased over time, and that Valley's internal controls relating to loans were inadequate. In response to this information, professional standards required Crowe to have heightened professional skepticism and perform additional audit procedures to obtain more persuasive audit evidence relating to the GVA generally and PCA specifically. Crowe's failure to do so resulted in the issuance of an unqualified opinion without sufficient appropriate audit evidence to support it.

### 5. Crowe's Failure to Communicate with the Predecessor Auditor Prevented It from Issuing an Audit Opinion in Either 2010 or 2011

54. Crowe failed to properly perform audit procedures required for the 2010 Audit— an initial year audit. Crowe failed to, among other things, comply with the requirements of AU 315–*Communications Between Predecessor and Successor Auditors*. AU 315 required Crowe to make specific inquiries with Valley's predecessor auditor, McGladrey, prior to being engaged to perform the 2010 Audit. Crowe failed to do so. Crowe further failed to comply with its own audit program when it did not review audit workpapers from McGladrey's 2009 audit of Valley.

55. Crowe's negligent failure to communicate with McGladrey prior to being engaged and failure to review McGladrey's 2009 workpapers in planning the 2010 Audit meant that it lacked critical knowledge obtained by its predecessor, which led Crowe to employ deficient audit procedures for the 2010 Audit. For example, discussions with McGladrey or review of its workpapers would have detailed the heightened audit procedures McGladrey applied to Valley's

17

troubled PLMBS portfolio, which should have caused Crowe to exercise greater professional skepticism with respect to the structure and purpose of Bank's 2010 PLMBS sales transactions.

56.     Furthermore, Crowe's violation of AU 315, rendered it without a sufficient basis to issue its audit reports on the 2010 and 2011 financial statements.

### 6. Crowe Failed to Determine that the 2010 PLMBS Sales Transactions Violated GAAP, Which Required the Financial Statements to be Restated in 2011

57.     During 2010, Valley entered into and financed securities sales transactions of impaired PLMBS to Bank insiders and preferred borrowers in order to avoid recording losses that would have negatively impacted Valley's capital ratios.

58.     Crowe was required by professional standards, including AU 410–*Adherence to Generally Accepted Accounting Principles* and its own audit program to test securities sales, including, but not limited to, determining that the transactions were accounted for and disclosed in compliance with GAAP.  However, Crowe's audit procedures failed to do so.

59.     In further violation of professional standards, Crowe ignored information it obtained during the 2010 Audit, including its knowledge that Valley financed the PLMBS sales well-above fair market value to Bank insiders and preferred borrowers.

60.     In response to this information, professional standards required Crowe to employ heightened professional skepticism and to perform additional audit procedures to obtain more persuasive audit evidence relating to the transactions and their compliance with GAAP.  Crowe failed to do so.  Crowe's inadequate procedures relating to securities were performed in such a grossly deficient manner that Crowe failed to obtain sufficient appropriate audit evidence required by GAAS to issue an unqualified opinion for the 2010 Audit.

61.     Crowe's improper issuance of an unqualified audit opinion in 2010 allowed
Valley to avoid recognizing losses and allowed Henson to continue making loans in violation of
the Consent Order, resulting in substantial losses to Valley.

62.     Following Crowe's unqualified opinion for the 2010 Audit, Valley's regulators
required the Bank to unwind the PLMBS transactions because they violated GAAP and lacked
economic substance.  Valley's restated 2010 financial statements were issued along with
Crowe's opinion on RVBI's comparative 2011 and 2010 financial statements, on May 21, 2012.

63.     Under these circumstances, Crowe was required to exercise heightened
professional skepticism in light of efforts by the Bank to avoid recording losses, including
through the ALLL.  Crowe failed to do so.

### 7. Crowe Violated Integrity and Independence Standards in Issuing Two Letters to Regulators that Failed to Disclose the Bank's Manipulation of its Financial Statements through the ALLL

64.     In connection with the 2011 Audit, Crowe demonstrated a lack of integrity, thus
impairing its independence.  Valley management requested that Crowe provide a letter that it
could use to satisfy Florida bank regulators that the ALLL methodology employed had been
validated.  Prior to sending the letter, internal emails among the Crowe audit team stated that it
had "not been engaged [,] paid for," or performed an ALLL methodology validation review and
concluded that Crowe should not provide the requested assurance.  Nonetheless, Crowe provided
the ALLL letter.  At the time the letter was provided, Crowe knew that management was
"skirting the system" and inappropriately manipulating the ALLL.

65.     In late 2012, Crowe began work on the 2012 Audit.  During the course of its audit
work, Crowe and Valley management disagreed over Valley's ALLL methodology as a result of
further manipulation of the ALLL by Bank management, ultimately leading to Crowe's
termination in December 2012.  Although Crowe was required by 12 C.F.R. §363.3(c) to

disclose to regulators the circumstances of its termination and the nature of its disagreement with management, it failed to do so. Valley's letter notifying regulators that Crowe had been terminated stated that "[i]n connection with the audits of the two fiscal years ended December 31, 2011, there were no disagreements with Crowe Horwath LLP on any matter of accounting principle or practice, financial statement disclosure, or audit procedure or scope." Instead of disclosing to regulators the disagreement relating to Valley's ALLL methodology that caused Crowe's termination, Crowe only stated "we agree with such statements." In doing so Crowe failed, once again, to disclose its knowledge of Henson's scheme to mask the Bank's deteriorating financial condition.

**D.  Crowe's Audit Failures Caused Damages to the Bank**

66.     In conducting the 2010 Audit and the 2011 Audit, Crowe violated professional standards, including AU 311–*Planning and Supervision*, by failing to obtain a sufficient understanding of Valley to plan the audit properly, failing to make an accurate assessment of Valley's audit risks, and failing to design effective audit procedures. As a result of these audit failures, Crowe did not obtain sufficient audit evidence to provide a valid basis for its unqualified opinions. In addition, when Crowe discovered that Valley's financial statements were being manipulated to mask loan and investment losses, professional standards prohibited Crowe from issuing an unqualified opinion.

67.     Had Crowe done anything other than issue unqualified audit opinions, Henson's scheme to conceal the financial condition of Valley through the manipulation of the Bank's financial statements and related misconduct would have been discovered in 2011. As a result, Valley would have avoided additional loan losses, further deterioration of the Bank's financial condition, and resulting damages. Instead, Crowe's audit failures allowed Henson's scheme, his

related misconduct, and his improper lending to continue, which resulted in a significant deterioration of the Bank's financial condition and at least $21 million in additional loan losses from March 31, 2011 (the date of Crowe's 2010 audit report) until June 4, 2013 (the date Henson finally was forced to resign).

## V.     CLAIMS FOR RELIEF

### COUNT I
**Accounting Malpractice**

68.     Plaintiff FDIC-R re-alleges and incorporates each of the allegations contained in paragraphs 1-67 of this Complaint as though fully set forth herein.

69.     Crowe owed Valley, its client, a duty to perform its audits and professional services in accordance with applicable professional standards.  As alleged above, Crowe breached its duty in at least the following ways:

   a.  failing to communicate with the predecessor auditor, McGladrey, resulting in a failure to investigate why Valley terminated its relationship with McGladrey and a failure to discover financial losses disguised as inappropriate PLMBS sale transactions;

   b.  improperly issuing an audit opinion on the 2010 financial statements or the audit opinion on the comparative financial statements for 2011 and 2010 due to the failure to communicate with the predecessor auditor;

   c.  inappropriately approving the 2010 PLMBS sale transactions used to disguise financial losses, given that the PLMBS transactions were not GAAP compliant and Crowe failed to obtain sufficient appropriate audit evidence to support Valley's sale treatment, which ultimately resulted in the restatement of the 2010 financial statements;

   d.  ignoring serious internal control weaknesses and failing to design and execute appropriate substantive audit procedures to mitigate such risks;

   e.  failing to determine whether Valley had a competent, independent audit committee;

   f.  failing to develop sufficient audit procedures to mitigate the fraud risk that resulted from Valley's lack of formal process for identifying TDRs;

g.   failing to exercise professional skepticism and due care in assessing Valley's ALLL methodology, a significant estimate in Valley's financial statements and an area identified by Crowe as a fraud risk;

h.   failing to obtain a sufficient understanding of Valley's ALLL methodology, including its FAS 5 general reserves and its methodology for identifying and evaluating impaired loans under FAS 114;

i.   failing, in 2010, to perform audit procedures related to the identification and evaluation of impaired loans;

j.   failing to investigate, and instead blindly accepting management's representation of, the Portfolio Concentration Adjustment, the means by which Valley manipulated its financial statements;

k.   improperly issuing an unqualified opinion despite its knowledge that Henson was manipulating Valley's financial statements and managing its earnings through the ALLL;

l.   eliminating, in 2011, a high-risk category of loans from review, and, in 2010 and 2011, knowingly accepting insufficient appraisals and unjustifiable management representations in violation of the requirement to obtain competent audit evidence for the valuation of impaired loans;

m.   violating ET §102–*Integrity and Objectivity*, the fundamental ethical rule on integrity, by issuing a misleading letter to satisfy Florida regulators that the ALLL methodology had been validated when, in fact, Crowe knew that management was inappropriately manipulating Valley's ALLL through the PCA;

n.   failing to obtain sufficient appropriate audit evidence during the 2010 and 2011 audits that the financial statements were free from material misstatement due to fraud or error; and

o.   failing to disclose its disagreements with management regarding the ALLL, a significant fraud risk area for Valley, when Crowe was terminated during the 2012 audit, after a disagreement with management on the ALLL methodology.

70.   Each of Crowe's cited audit failures above violated applicable professional standards including, but not limited to, at least the following:

a.   AU 150       Generally Accepted Auditing Standards.

b.  AU 220        Independence.

c.  AU 230        Due Professional Care in the Performance of Work.

d.  AU 311        Planning and Supervision.

e.  AU 314        Understanding the Entity and Its Environment and Assessing the Risks of Material Misstatement.

f.  AU 315        Communications Between Predecessor and Successor Auditors.

g.  AU 316        Consideration of Fraud in a Financial Statement Audit.

h.  AU 318        Performing Audit Procedures in Response to Assessed Risks and Evaluating the Audit Evidence Obtained.

i.  AU 325        Communicating Internal Control Related Matters Identified in an Audit.

j.  AU 326        Audit Evidence.

k.  AU 333        Management Representations.

l.  AU 334        Related Parties.

m.  AU 336        Using the Work of a Specialist.

n.  AU 9336       Using the Work of a Specialist: Auditing Interpretations of Section 336.

o.  AU 339        Audit Documentation.

p.  AU 342        Auditing Accounting Estimates.

q.  AU 350        Audit Sampling.

r.  AU 380        The Auditor's Communication With Those Charged With Governance.

s.  AU 410        Adherence to Generally Accepted Accounting Principles.

t.  AU 508        Reports on Audited Financial Statements.

u.  ET §102       Integrity and Objectivity.

v.  ET §202       Compliance with Standards.

71.     During the course of its engagement as Valley's independent external auditor, Crowe repeatedly violated governing professional standards in its audits of Valley.  Had Crowe complied with applicable professional standards and done anything other than issue an unqualified opinion, Henson's scheme to mask the deteriorating financial condition of Valley would have been discovered well before it was ultimately uncovered by regulators.  Thus, Valley would have avoided Henson's origination and funding of millions of dollars of loans that were made in violation of the Consent Order in 2011, 2012, and 2013, which caused Valley to suffer damages in an amount to be proven at trial.

## COUNT II
### Gross Negligence

72.     Plaintiff FDIC-R re-alleges and incorporates each of the allegations contained in paragraphs 1-71 of this Complaint as though fully set forth herein.

73.     In performing the 2010 Audit and the 2011 Audit, Crowe's conduct demonstrated very great negligence and indifference to the consequences that could result, thereby constituting gross negligence.

74.     As a direct and proximate result of Crowe's grossly negligent failure to perform its duties in connection with the 2010 Audit and the 2011 Audit, Valley suffered damages in an amount to be proven at trial.

## COUNT III
### Negligent Misrepresentation

75.     Plaintiff FDIC-R re-alleges and incorporates each of the allegations contained in paragraphs 1-74 of this Complaint as though fully set forth herein.

76.     Pursuant to professional standards and the terms of Crowe's engagement letter, Crowe owed a duty to Valley to provide accurate statements in issuing its opinions for the 2010 Audit and the 2011 Audit.

77.     In Crowe's audit opinion issued on March 31, 2011, with respect to Valley's financial statements as of December 31, 2010, Crowe falsely represented it performed its audit in accordance with GAAS and that the financial statements were free from material misstatement in conformity with GAAP.

78.     In Crowe's audit opinion issued on May 21, 2012, with respect to Valley's comparative financial statements as of December 31, 2011 and December 31, 2010 (as restated), Crowe falsely represented that it was independent, that it performed its audit in accordance with GAAS, and that the financial statements were free from material misstatement in conformity with GAAP.

79.     Valley justifiably relied on Crowe's false representations.  Had the material facts concerning the matters misrepresented by Crowe to Valley been known, Henson's scheme of originating and funding of millions of dollars of loans in violation of the Consent Order in 2011, 2012, and 2013 would have ended well before it was ultimately uncovered by regulators, significantly reducing the losses that Valley sustained.

80.     As a direct and proximate result of Crowe's negligent misrepresentations, Valley suffered damages in an amount to be determined a trial.

## VI.     PRAYER FOR RELIEF

For these reasons, the FDIC-R requests that the Court award the FDIC-R judgment against Crowe for:

a.   actual damages in an amount to be proven at trial;

b. punitive damages in an amount to be determined at trial for Crowe's grossly negligent performance of the 2010 Audit and 2011 Audit, its multiple departures from basic auditing standards, such as due care, professional skepticism, sampling, and contact with the predecessor auditor; its failure to address in any meaningful way known fraud risks—even when those risks were realized and were identified by the engagement team; its knowledge that Valley had inadequate internal controls; its knowledge that management was manipulating its financial statements, including its repeated failure to address or disclose this manipulation; and its violation of integrity standards through misleading letters to bank regulators;

c. prejudgment and post-judgment interest as allowed by law;

d. costs of court;

e. return of any and all fees that Valley paid to Crowe for the negligent audits; and

f. any other relief allowed by law and deemed appropriate by the Court.

## VII.     <u>DEMAND FOR JURY</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedures, the FDIC-R respectfully demands a trial by jury in this action of all claims and issues so triable.

Respectfully submitted,

**FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR VALLEY BANK**

Dated: June 9, 2017

*/s/ Susan Valentine*
One of its Attorneys

Susan Valentine (ARDC No. 6196269)
Lydia A. Bueschel (ARDC No. 6274638)
Elisa Wesche (ARDC No. 6305635)
Yanick E. Polycarpe (ARDC No. 6237892)
VALENTINE AUSTRIACO & BUESCHEL, P.C.
105 West Adams, 35th Floor
Chicago, Illinois 60603
(312) 288-8285 – Telephone
(312) 638-8137 – Facsimile
svalentine@VABlawfirm.com
lbueschel@VABlawfirm.com
ewesche@VABlawfirm.com
ypolycarpe@VABlawfirm.com